[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 27, 2006
THOMAS K. KAHN
CLERK

No. 05-14899
Non-Argument Calendar

_____

D. C. Docket No. 04-00025-CV-ORL-28-DAB

VIVIAN BURKE-FOWLER,

Plaintiff-Appellant,

versus

ORANGE COUNTY, FLORIDA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(March 27, 2006)**

Before DUBINA, CARNES and HULL, Circuit Judges.

PER CURIAM:

Vivian Burke-Fowler appeals the district court's grant of summary judgment to her former employer, Orange County, Florida, in her suit alleging race discrimination under federal law and marital status discrimination under Florida state law. We affirm.

**I.**

In September 1984 Douglas Fowler was convicted of murder and robbery and was sentenced to life in prison under the custody of the Florida Department of Corrections. In April 1987 Vivian Burke was hired by the Orange County Corrections Department and soon thereafter became a certified correctional officer.[1] In 1993 she was assigned to the Municipal Justice Building Annex, where she supervised inmates facing death or life in prison, including Fowler. She worked at the Annex until it was closed in June 1999.

In January 1999 Fowler was assigned to the Annex while awaiting his appeal, and at some point while he was an inmate there, he chatted with Burke. As the conversation progressed, they realized they shared an acquaintance with a woman named Carolyn. Burke and Fowler also determined that they might have met each other once before during the early 1980s.

---

[1] This opinion refers to Vivian Burke by her maiden name when discussing events that occurred before her marriage to Douglas Fowler, and then following her marriage, by her hyphenated name, Burke-Fowler, as it appears in the style of this case.

Fowler was incarcerated in the Annex until June 1999. During that time, Burke had direct contact with and directly supervised Fowler on about twenty occasions, and she asserts that her conduct during these interactions was always strictly professional. In August 1999 Fowler was transferred back to Okeechobee Correctional Institution to continue serving his life sentence.

In November 1999 Burke received a letter from Fowler at her home. Their mutual acquaintance, Carolyn, allegedly had placed the letter in Burke's mailbox. Burke began corresponding with Fowler, and they exchanged weekly letters. The next month she requested visitation privileges at Okeechobee Correctional Institution and began visiting Fowler regularly. In November 2000 they were married in the Okeechobee prison. Burke-Fowler did not tell any of her supervisors about her relationship with Fowler or about her marriage to him.

After they were married, Burke-Fowler continued to visit Fowler, corresponded with him, and sent him money until he was released on parole in January 2002. In March 2002 Burke-Fowler's supervisor asked her if she was "married to an inmate," and she replied that she was. Brief of Appellant at 8. On March 29, 2002, Burke-Fowler received a notice of investigation from her employer, Orange County.

During almost fifteen years of employment, Burke-Fowler had received

3

high ratings in her performance evaluations. She admits that she knew about Orange County's policy prohibiting correctional officers from fraternizing with inmates, but she believed that this only applied to inmates housed in Orange County's facilities. She asserts that Fowler's brother Jerome, who was a certified correctional officer employed by Orange County, continued to have contact with his brother after his incarceration. Burke-Fowler says that Jerome Fowler's supervisors were aware of that interaction, and he was not disciplined for it.

In early June 2002 Burke-Fowler was terminated for the stated reason that she had violated the County's anti-fraternization policies. She filed a grievance claiming wrongful termination. After the formal grievance process, an arbitration hearing was held, and the arbitrator found that Burke-Fowler's termination was justified. She filed suit against Orange County on December 22, 2003, alleging that the County had discriminated against her on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq., and 42 U.S.C. § 1981, and on the basis of marital status in violation of the Florida Civil Rights Act, Fla. Stat. § 760.10.

The County filed a motion for summary judgment on April 1, 2005, and on June 30, 2005 the district court granted that motion as to all of Burke-Fowler's claims. Her motion for reconsideration was denied.

## II.

We review a district court's grant of summary judgment <u>de novo</u>. <u>Jones v. Dillard's, Inc.</u>, 331 F.3d 1259, 1262 (11th Cir. 2003). Burke-Fowler, who is African American, contends that summary judgment against her on her Title VII race discrimination claim should be reversed because she established a prima facie case and showed that her termination for fraternization with an inmate was a pretext for race discrimination.

The two theories of intentional discrimination under Title VII are disparate treatment discrimination and pattern or practice discrimination. <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1286 (11th Cir. 2000). Disparate treatment claims can be proven using direct evidence (requiring no inference or presumption) or circumstantial evidence. <u>Id.</u> Racial discrimination claims based on circumstantial evidence are evaluated under the <u>McDonnell Douglas</u> burden shifting framework. <u>See</u> <u>id.</u> To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job. <u>Id.</u> If the plaintiff satisfies these elements, then the defendant must show a legitimate, non-

5

discriminatory reason for its employment action. Id. If it does so, then the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination. Id.

Burke-Fowler contends that the county is liable for disparate treatment discrimination. There is no dispute that Burke-Fowler meets the first, second, and fourth elements of her prima facie case. The third element is the only one at issue here. When a claim alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations and quotation marks omitted). When making that determination, "[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[2] Id. (citation omitted); see also Nix v. WLCY Radio/Rahall Commc'ns,

---

[2] This Circuit's "nearly identical" misconduct requirement was called into question by a later panel decision which stated:

> [T]he law does not require that a "similarly situated" individual be one who has "engaged in the same or nearly identical conduct" as the disciplined plaintiff. Instead, the law only requires "similar" misconduct from the similarly situated comparator.

Alexander v. Fulton County, Ga., 207 F.3d 1303, 1334 (11th Cir. 2000) (citations omitted). However, we are bound to follow Maniccia's "nearly identical" standard rather than the standard

738 F.2d 1181, 1185 (11th Cir. 1984) (requiring a plaintiff bringing a discriminatory discipline claim to show "that the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained") (citations, quotation marks, and alterations omitted).

Orange County contends that because Burke-Fowler initiated an intimate relationship with and then secretly married a convicted murderer incarcerated in Okeechobee state prison shortly after he was under her supervision at the Annex, she violated the County's well-established policies. Those violations, according to the County, were the basis for Burke-Fowler's termination as a correctional officer. The County argues that Burke-Fowler failed to present evidence of any correctional officer outside of her protected class who engaged in similar conduct but was not terminated and that she failed to show that the County's stated reason for firing her was pretextual. The County asserts that Burke-Fowler violated the following policies and codes of conduct:

> Corrections Department Admin. Order, AM. 200, Code
> of Ethics, IV, Procedure:  Employee Conduct 1(p):

---

articulated in Alexander because when a later panel decision contradicts an earlier one, the earlier panel decision controls. Walker v. Mortham, 158 F.3d 1177, 1188–89 (11th Cir. 1998) (following the "earliest case" rule to resolve intra-circuit splits).

7

Employees will not fraternize with inmates, clients, or residents.

Corrections Department Admin. Order, AM. 200, Code of Ethics, IV, Procedure: Employee Conduct 1(q):

Employees will not correspond, call or receive phone calls from inmates, clients or residents without prior written approval of their Department Manager.

Corrections Department Admin. Order, AM. 200, Code of Ethics, II, Policy:

Employees are expected to adhere to the Orange County Corrections Department Code of Ethics, the Code of American Correctional Association and other appropriate professional organization standards associated with their specific profession.

Personnel Policy Manual, Section Seven, Code of Conduct, General Statement, #1:

Employees shall in no way act in any manner which may discredit the government of Orange County, public officials, fellow employees or themselves.

Brief of Appellee at 13–14.

Burke-Fowler contends that she has shown an appropriate class of comparators—correctional officers who were disciplined for fraternizing with inmates. She asserts that the County discriminated against her on the basis of her race because it terminated her but did not terminate white correctional officers who fraternized with inmates. She also alleges that the County terminates

8

minority correctional officers for fraternization with inmates over ninety percent of the time but that white correctional officers retain their jobs over sixty-six percent of the time for the same violation. She argues that these statistics show that the County's decision to terminate her was motivated by racial animus.

Burke-Fowler points to Cynthia Robinson, a white correctional officer who was not terminated for her romantic relationship with a woman who was arrested, convicted, and placed on probation. Robinson received telephone calls from this inmate while she was in jail, and Robinson did not notify her supervisors about the relationship. Because of her conduct, Robinson was suspended without pay and required to complete an ethics class. The County contends that Robinson is not similarly situated to Burke-Fowler because Robinson began the romantic relationship before her partner was incarcerated and without knowledge of her partner's criminal history.

Another white correctional officer, Ronald Austin, was disciplined but not terminated after he admitted to having a personal relationship with an inmate. Austin began that relationship prior to the woman's arrest but continued it during her incarceration. An investigation did not reveal whether Austin knew at the time their relationship began that the woman had a criminal history. Austin received a written reprimand for violating the anti-fraternization policy.

The primary difference between Robinson's and Austin's misconduct and Burke-Fowler's is that it is undisputed that Burke-Fowler established a relationship with full knowledge of the inmate's status as an inmate. By contrast, Robinson and Austin began their relationships before their romantic partners' incarceration occurred.

Burke-Fowler also mentions Wilbur Smith and Hershel Pipkins, white male correctional officers, who had personal relationships either with known criminals or with inmates and were not terminated. Smith was seen giving a ride to a reputed prostitute but was not disciplined for fraternization. Pipkins was cited for fraternization after he discussed his personal family problems with an inmate. Burke-Fowler asserts that Austin and Pipkins had relationships with inmates, appeared in court on their behalf, and posted bail money for them.

Burke-Fowler contends that she maintained a professional relationship with Fowler while he was under her supervision and did not violate County policy as it was actually applied, and yet she was terminated while white correctional officers who appeared in court on behalf of inmates and posted bond for them retained their jobs. She asserts that her "sole 'violation' was to marry a man incarcerated in another jail." Reply Brief of Appellant at 14.

The County contends that none of the individuals whom Burke-Fowler

10

listed as comparators engaged in the type or degree of fraternization that she participated in with Fowler and that its reason for firing Burke-Fowler was legitimate and non-discriminatory. The County argues that it did not single her out for discipline and that "[n]umerous non-African-American correctional officers were terminated or resigned pending their investigation for fraternization with inmates." Brief of Appellee at 31.

The comparators presented by Burke-Fowler did not engage in misconduct that was "nearly identical" to hers. See Maniccia, 171 F.3d at 1368. Robinson and Austin did fraternize with inmates; however, the differences between their conduct and Burke-Fowler's are significant. Burke-Fowler pursued a romantic relationship with an incarcerated person shortly after he left her direct supervision. Robinson and Austin had relationships with people who subsequently became incarcerated. Smith and Pipkins were not romantically involved with inmates. None of them are appropriate comparators.

Because she failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination, Burke-Fowler did not establish a prima facie case of race discrimination. See Joe's Stone Crab, 220 F.3d at 1286. Concerning the statistical information Burke-Fowler offers as evidence of discrimination, we have noted that "[t]he Supreme Court has emphasized the

11

importance of looking to the proper base group when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves." Cooper v. Southern Co., 390 F.3d 695, 717 (11th Cir. 2004) (quotation marks and citation omitted). For that reason, "statistics without a proper analytic foundation are virtually meaningless." Id. (quotation marks, alterations, and citation omitted). Burke-Fowler did not provide any specific facts or details about the employees other than Robinson, Austin, Smith, and Pipkins who were disciplined for fraternization. Statistics that merely describe these employees as minority or non-minority and disclose whether they were fired or disciplined less severely proves nothing without more information about the particular circumstances involved in each situation. See Cooper, 390 F.3d at 717.

Different types and degrees of misconduct may warrant different types and degrees of discipline, and a plaintiff does not show disparate impact racial discrimination or disparate treatment discrimination merely by citing statistics. See Joe's Stone Crab, 220 F.3d at 1276 (observing that "holding employers liable for statistical imbalances per se is inconsistent with Title VII's plain language and statutory purpose"). Even if Burke-Fowler's claim were generously construed as a pattern and practice argument, the statistical evidence she provides is not strong

12

enough to establish a prima facie case. See id. at 1287 ("A plaintiff may establish a pattern or practice claim through a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally.").

Because Burke-Fowler did not establish a prima facie case on her Title VII and § 1981 claims, we affirm the district court's grant of summary judgment to Orange County on those claims.

## III.

Burke-Fowler contends that summary judgment against her on her Florida state law marital status discrimination claim should be reversed because the only reason given for Burke-Fowler's termination was her marital status. The County contends that Burke-Fowler's claim for marital status discrimination under Florida law fails as a matter of law because the Florida Civil Rights Act does not define "marital status" to include the identity or conduct of one's spouse. The County argues that it terminated Burke-Fowler because of her fraternization with an inmate and not because of her marital status.

The pertinent portion of the Florida Civil Rights Act provides:

> (1) It is an unlawful employment practice for an employer:

13

(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . marital status.

Fla. Stat. § 760.10(1)(a). We once certified a question to the Florida Supreme Court concerning this statute. Donato v. Am. Tel & Tel. Co., 146 F.3d 1329, 1332 (11th Cir. 1998) (asking "[c]an an individual proceed under the Florida Civil Rights Act by alleging that he was discharged, in violation of the prohibition on marital status discrimination, because he is married to an individual who filed suit against his employer?"). The Florida Supreme Court answered that certified question in the negative and held that the term "marital status," in the context of Fla. Stat. § 760.10(1)(a), "means the state of being married, single, divorced, widowed or separated, and does not include the specific identity or actions of an individual's spouse." Donato v. Am. Tel. & Tel. Co., 767 So. 2d 1146, 1155 (Fla. 2000).

The Florida Supreme Court's Donato decision controls in the present case. Burke-Fowler was not fired because she was married; she was fired because she fraternized with an inmate and then married him. The County does contend that Burke-Fowler's violation of the policy against fraternization was somehow greater

14

in magnitude than the violations committed by Robinson and Austin because Burke-Fowler ultimately married the inmate with whom she fraternized, while Robinson and Austin merely fraternized out of wedlock. That distinction, however, is based on the County's reasonable interpretation of its fraternization policy and it does not run afoul of Fla. Stat. § 760.10(1)(a).

The County did not discriminate against Burke-Fowler simply because she was married. Therefore, we affirm the district court's grant of summary judgment to Orange County on Burke-Fowler's claim for marital status discrimination.

**AFFIRMED.**