[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 15, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12598
Non-Argument Calendar

_____

D. C. Docket No. 05-00371-CV-D-N

MELVIN WRIGHT,

Plaintiff-Appellant,

versus

SANDERS LEAD COMPANY, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(February 15, 2007)**

Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

Melvin Wright, a black male, brought suit against his former employer,

defendant Sanders Lead Company, Inc. ("Sanders Lead"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) and (m), and 42 U.S.C. § 1981. The district court granted summary judgment to Sanders Lead, based on its conclusion that Wright had failed to establish a *prima facie* case of discrimination. Because Wright did not establish a *prima facie* case of discrimination on the basis of race, we AFFIRM.

## I. BACKGROUND

Sanders Lead recycles lead acid storage batteries. Wright was a second shift supervisor in Sanders Lead's casting and alloy department, and he oversaw a number of employees. Wright's department was responsible for extracting, cleaning, and storing the lead. He had been employed in that position since approximately 1979.

On 4 February 2004, Austin Turner, a security guard at Sanders Lead, observed two other employees of the company, Travoris Green and Buddy Whitman, riding in a shipping truck behind the company's main office. At the time, Green was employed in the casting and alloy department, and he worked under Wright's supervision. Because Turner thought it unusual for Green to be riding in a shipping department truck, he followed the two men behind the office. Once Turner approached the truck he saw that Green and Whitman were smoking

2

cigarettes. Sanders Lead's internal rules and regulations, which are included in the company's employee handbook, expressly prohibit the use of tobacco anywhere on company property. Turner first reprimanded Green for being outside of his work area. He then ordered the employees to empty their pockets, and they complied. He confiscated two packages of cigarettes, one from each employee.

Turner subsequently called Wright to inform him that one of his subordinates had been caught smoking on company property, which is a terminable offense. Wright was at the work site at the time, however, and was unavailable; therefore, Turner instructed Johnny McClendon, another supervisor, to immediately notify Wright of the incident. Shortly after receiving word of Green's actions, Wright spoke by telephone with Turner. According to Wright, while discussing Green's misconduct, Wright said to Turner, "work with me on this." R1-14, Exh. 1 at 115.[1] Although Wright maintains that he intended this statement to mean that he was busy and needed some time to properly deal with disciplining Green, Turner interpreted Wright's statement as a request that Turner "let [Green] get by," or that Turner "not [] say anything else about it." R1-16, Exh. D at 30.

---

[1] Turner maintains that Wright also asked that he "let [Green] slide this time." R1-16, Exh. D at 30. Wright, however, disputes that version of events, contending that he only said "work with me." R1-14, Exh. 1 at 115-16. Regardless of what Wright actually said, it is undisputed that Turner interpreted Wright's statement as a request that he turn a blind eye to Green's wrongdoing. And it is clear that Wright's superiors believed that Wright, with his passing comment to Turner, was attempting to hide Green's misconduct.

3

Subsequent to these developments, Turner and Wright ascertained that one of the confiscated cigarette boxes contained a brown cigar consisting of a substance that appeared to be marijuana. According to Wright, after this discovery, Wright returned to his office and completed the process for terminating Green's employment. Wright also called his direct supervisor, Edgar Fannin, and notified him of the incident. Fannin instructed Wright to prepare the necessary paperwork to effectuate Green's termination; Wright replied that he had already done so. Green was terminated the following day, February 5. Whitman was also terminated because of the smoking incident.

Later that same day, however, Turner informed Wright's supervisor, Fannin, that Wright had "attempt[ed] to sweep something under the rug"–specifically, that Wright had sought to hide Green's wrongdoing from upper management during their phone conversation. R1-16, Exh. A at 4. Then, on February 6, Turner met with Bart Sanders, the plant manager, who oversees all of the company's operations. In that meeting, Turner reiterated to Sanders his allegation that Wright had asked Turner to turn a blind eye to Green's misconduct. Upon learning of these allegations, Sanders made the decision, effective that day, to suspend Wright, pending a further investigation by the company. When Wright arrived at work on February 6, he was denied entrance to the plant. That afternoon, in a phone call

4

with Fannin, Wright was first informed of Turner's allegations against him.

A number of internal meetings were subsequently held among the members of the company's upper management, including Sanders, Fannin, and Turner. After a series of discussions, the company decided to terminate Wright's employment. Wright was not informed of this decision until February 12; Fannin notified him of the decision by phone. Wright was not permitted to meet with Sanders after the decision was made, nor was he brought before the company and given an opportunity to dispute Turner's account of the events. When Sanders was later asked why Wright was terminated, he testified that, as plant manager, he had made the ultimate decision, although he had received the input of the other managers. Sanders also testified that he had terminated Wright because he believed that Wright had tried to

> to cover up misconduct by [] one of his workers . . . that he was the direct supervisor over, for multiple intolerable rules violations, and [tried] to sweep it under the rug and not bring it to light, keep it out of upper management's knowledge. And conceal[ed] the fact that these . . . rules violations took place.

R1-16, Exh. E at 28. Sanders further testified that he and the other managers had concluded that they could no longer "trust in [Wright] to represent the company's interests." Id. at 41. Sanders testified that race did not play a role in his decision to terminate Wright.

Approximately six weeks after Wright's termination, Whitman, who is white, and who had worked as a laborer in Sanders Lead's shipping department before being terminated (along with Green) for the smoking incident, reapplied for employment with Sanders Lead. Whitman was re-hired to work in the company's furnace department, for an hourly wage.

In October 2004 Wright filed suit in the Middle District of Alabama, alleging claims for wrongful discharge and discriminatory treatment in employment in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. He alleged that Sanders Lead discriminated against him because of his race and that other similarly situated white employees had received more favorable treatment than he did. Wright also alleged a separate state law claim for misrepresentation. Sanders Lead moved for summary judgment on all counts. The district court granted summary judgment in favor of Sanders Lead on Wright's Title VII and § 1981 claims, due to its conclusion that Wright had failed to make out a *prima facie* case of discrimination. Having granted summary judgment in favor of Sanders Lead on Wright's federal claims, the court, pursuant to 28 U.S.C. § 1367, declined to exercise supplemental jurisdiction over the remaining state claim.[2] The state claim was dismissed, without prejudice. This appeal followed.

_____

[2] 28 U.S.C. § 1367(c) provides that "the district court [] may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over

6

## II. DISCUSSION

We review a district court's grant of summary judgment *de novo*. Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1322 (11th Cir. 2006) (per curiam) (citation omitted). In doing so, we apply the same legal standards as those that controlled the district court. Real Estate Fin. v. Resolution Trust Corp., 950 F.2d 1540, 1543 (11th Cir. 1992) (per curiam) (citation omitted). According to those standards, set forth in Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In making this assessment, we review all facts and inferences in a light most favorable to the nonmoving party. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999) (citation omitted). "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" Id. (citations omitted).

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise discriminat[ing] against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). When a plaintiff's Title VII claim of racial

---

which it has original jurisdiction." On appeal, Wright does not challenge the dismissal of the state law claim. Thus we address solely the district court's decision to grant summary judgment on the Title VII claims.

discrimination is based on circumstantial evidence, it is evaluated under the so-called McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 1824-25 (1973).[3] Under that three-step analysis, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Once the plaintiff has presented a *prima facie* case of discrimination, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its employment action. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. After the employer has done so, the plaintiff then must be given an opportunity to show that the reason provided is pretextual, or to "cast sufficient doubt on the employer's proffered nondiscriminatory reason[] to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reason[] [was] not what actually motivated its conduct.'" Combs, 106 F.3d at 1538 (citation omitted).

We begin our analysis with Wright's *prima facie* case. In order to present a *prima facie* case of racial discrimination, an employee must "show that: (1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment

_____

[3] The same three-step McDonnell Douglas analysis applies to claims brought pursuant to § 1981 alleging discriminatory treatment in employment. Turnes v. AmSouth Bank, NA, 36 F.3d 1057, 1060 (11th Cir. 1994) (citation omitted). As a result, if a plaintiff's Title VII claim fails under the McDonnell Douglas framework, so too does the plaintiff's § 1981 claim.

action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job." Burke-Fowler, 447 F.3d at 1323. A *prima facie* case must be established with "facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam) (citations omitted).

Here, there is no dispute that Wright, who is African-American, was a member of a protected class, and that he suffered an adverse employment action when Sanders Lead terminated him in February 2004. The pivotal issue on appeal is whether Wright established that Sanders Lead treated a similarly situated, non-minority employee more favorably than it treated him. "If a plaintiff fails to show the existence of a similarly situated [non-minority] employee, summary judgment is appropriate where no other evidence of discrimination is present." Id. (emphasis omitted).

In discussing the "similarly situated" aspect of a *prima facie* discrimination case, we have stated that a plaintiff must show that he and the non-minority employee with whom he seeks comparison are "similarly situated in all relevant respects." Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.) (citing Holifield, 115 F.3d at 1562) (emphasis added), modified on other grounds,

151 F.3d 1321 (11th Cir. 1998). In addition, in cases–such as Wright's–involving an employer who takes disciplinary action against two workers and allegedly treats a non-minority employee more favorably than the minority employee, we have held that "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Id. (citing Holifield, 115 F.3d at 1562).

In this case, Wright argues that he is similarly situated with Whitman, the white shipping department employee who was caught smoking on company premises. Wright contends that while he was immediately fired for his misconduct without any chance to rebut the allegations against him, Whitman was permitted to explain his version of the events to Sanders, the plant manager. Moreover, Wright asserts that Whitman was eventually re-hired by Sanders Lead and was given a new position, whereas Wright was never given such an opportunity. As he explains, "Sanders gave Whitman, a white man, a second chance by rehiring him . . . but he never informed Wright, a black man, that he could come back to work." Appellant's Br. at 8 (emphasis in original). Based on these facts, Wright contends that he is similarly situated to Whitman, a non-minority, and that Sanders Lead treated Whitman more favorably than it treated him.

The flaw in this argument, as the district court properly surmised, is that

Wright failed to establish that he and Whitman were "similarly situated in all relevant respects." Jones, 137 F.3d at 1311. First, the two employees did not engage in similar acts of misconduct. The evidence suggests that Whitman was fired for smoking on company premises, whereas Wright was fired because he asked a guard not to report his employee for a rule violation. Whitman, a laborer, committed a breach of safety, but Wright, a supervisor, committed a breach of trust. The acts of misconduct for which the two men were disciplined were substantially different. We have stated that the comparator's misconduct must "be nearly identical [to the plaintiff's] to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." Burke-Fowler, 447 F.3d at 1323 (citation omitted); Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (same). Similarly, here, comparing Wright's transgression (covering up wrongdoing) with Whitman's (smoking) is akin to comparing apples with oranges.

Furthermore, while it is true that Whitman was later re-hired and Wright was not, Whitman's position involved an hourly wage and a general lack of supervisory responsibilities, whereas Wright's position was a salaried job and involved significant supervisory duties. These circumstances provide context as to why Wright–who was accused of an act of dishonesty–would be immediately divested

11

of his supervisory position and would not be re-hired, while Whitman–whose act of smoking did not involve dishonesty–would be permitted to return as an hourly employee in a different department, nearly two months later.

We conclude that Wright failed to establish that he was similarly situated with Whitman. "If two employees are not similarly situated, then the different application of workplace rules to them does not constitute illegal discrimination," and the plaintiff's *prima facie* case fails as a matter of law. Lathem v. Dept. of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999) (citation and internal quotation omitted). Nor does Wright offer any additional circumstantial evidence of racial discrimination, other than the simple fact that he lost his job, and that a white person who had been terminated (for different conduct) was subsequently re-hired (albeit in a different capacity). In light of the evidence presented, we conclude that Wright "failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination," and that therefore he did not establish a *prima facie* case of discrimination.[4] See Burke-Fowler, 447 F.3d at 1325. Because Wright failed on the first step of the McDonnell Douglas framework applicable to a discrimination claim, summary judgment was properly

---

[4] Because we conclude that Wright failed to establish a *prima facie* case, we need not consider whether Sanders Lead met its burden of showing a legitimate nondiscriminatory reason for its employment decision, or whether that reason was a pretext for discrimination. See Morris v. Emory Clinic, Inc., 403 F.3d 1076, 1082 (11th Cir. 2005) (per curiam).

12

entered for Sanders Lead on Wright's Title VII and § 1981 claims. Accordingly, the district court properly issued summary judgment in favor of Sanders Lead on Wright's racial discrimination claims.[5]

## III. CONCLUSION

Having reviewed the record and the arguments of the parties, we conclude that Wright failed to establish a *prima facie* case of discrimination on the basis of race, and that therefore summary judgment was properly entered for Sanders Lead. Accordingly, the district court's judgment is **AFFIRMED.**

---

[5] In his appeal, Wright makes occasional, cursory references to Section 2000e-2(m) of Title VII, the provision that permits an employee to allege an unlawful employment practice by demonstrating that the employee's race was "a motivating factor for an employment practice." 42 U.S.C. § 2000e-2(m). The Supreme Court has described this provision of Title VII as providing "an alternative for proving that an 'unlawful employment practice' has occurred." Desert Palace, Inc. v. Costa, 539 U.S. 90, 94, 123 S. Ct. 2148, 2151 (2003) (citing 42 U.S.C. § 2000e-2(m)). Although Wright's complaint was more general in nature (indicating only that he was suing under Title VII), his appellate brief occasionally mentions § 2000e-2(m) as a possible separate grounds for relief, that is, in addition to relief for race discrimination under § 2000e-2(a). See Appellee's Br. at 10-11, 15.

Even assuming that this claim was properly alleged as a separate basis for relief, we would nevertheless conclude that summary judgment for Sanders Lead was appropriate. The Supreme Court has held that a plaintiff suing under § 2000e-2(m) must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" Desert Palace, 539 U.S. at 101, 123 S. Ct. at 2155 (citing U.S.C. § 2000e-2(m)). As noted above, Wright presents no evidence that race was a motivating factor in his termination; in fact, the record makes clear that Sanders Lead terminated Wright based on the belief that he had acted dishonestly in attempting to cover up an employee's wrongdoing. Because nothing in the record suggests that race played "a motivating factor" in the decision to terminate Wright, summary judgment would be proper for Sanders Lead on a claim based on § 2000e-2(m).

13