[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15361
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 21, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:08-cv-00784-MEF-TFM

SYLVIA SUMMERS,

Plaintiff-Appellant,

versus

THE CITY OF DOTHAN, ALABAMA,

Defendant-Appellee,

JOHN R. POWELL,
Chief, in his Official Capacity as Chief
of Police for Dothan, Alabama,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 21, 2011)

Before EDMONDSON, MARTIN, and KRAVITCH, Circuit Judges.

PER CURIAM:

Sylvia Summers appeals the district court's grant of summary judgment in favor of her former employer, the City of Dothan ("the City") on her discrimination and retaliation claims, under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). She argues that the district court erred in granting summary judgment on her race and sex discrimination and retaliation claims. After careful review of the record and the parties' briefs, we affirm.

I.

Summers first argues that the district court erred in granting the City's motion for summary judgment on her race and sex discrimination claims. She asserts that she established a prima facie case of discrimination, by showing other similarly situated employees, outside her protected class, who were not punished as harshly as her, despite violating the same rules in the same manner, and further that the City's reasons for disciplining her were mere pretext for discrimination. "This Court reviews de novo summary judgment rulings and draws all inferences and reviews all evidence in the light most favorable to the non-moving party." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). Summary judgment is

appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." Moton, 631 F.3d at 1341. The opposing party must offer more than a "mere scintilla of evidence" in support, such that "the jury could reasonably find for that party." Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162 (11th Cir. 2006). "Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989).

Title VII prohibits an employer from discriminating against a person based on race or sex. 42 U.S.C. § 2000e-2(a)(1). Likewise, under 42 U.S.C. § 1981, an employee has the right to be free of intentional racial discrimination in the performance of a contract. The elements required to establish a § 1981 claim are the same as those required to establish a Title VII claim. Rice-Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000).

A plaintiff may establish a discrimination claim through the introduction of direct or circumstantial evidence of discrimination. Dixon v. The Hallmark

3

Companies, Inc., 627 F.3d 849, 854 (11th Cir. 2010). Where, as here, the plaintiff relies on circumstantial evidence of discrimination, we apply the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). Under that framework, a plaintiff is first required to establish a prima facie case of discrimination. Id. To do that, she may show that: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) her employer treated similarly situated employees who were not members of her protected class more favorably; and (4) she was qualified to do the job. Burke-Fowler v. Orange Cnty., 447 F.3d 1319, 1323 (11th Cir. 2006). If the plaintiff presents a prima facie case, the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. Alvarez, 610 F.3d at 1264. If the defendant meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination. Id.

In determining whether employees are similarly situated in cases involving allegedly discriminatory discipline, we evaluate "whether the employees [were] involved in or accused of the same or similar conduct and [were] disciplined in different ways." Burke-Fowler, 447 F.3d at 1323 (quotation marks omitted). The

4

quantity and quality of the comparator's misconduct must be "nearly identical" to the plaintiff's misconduct, in order "to prevent courts from second-guessing employers' reasonable decisions." Id. (quotation marks omitted). Also, proffered comparators' actions are only relevant if it is shown that the decision maker knew of the prior similar acts and did not discipline the rule violators. See Jones v. Gerwens, 874 F.2d 1534, 1542 (11th Cir. 1989). Knowledge of a prior act cannot be imputed on a decision maker, because "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1262 (11th Cir. 2001).

Summers, an African-American woman, was employed by the City as a police officer. Her employment was terminated by the City on June 25, 2007, after she received two major offenses for failing to comply with the police department's rules and regulations. Summers argues that both instances of discipline were the result of race and sex discrimination.

The first disciplinary action was taken after Summers failed to swear to the arrest complaint following her April 5, 2006 arrest of Brian Shack for criminal trespass and outstanding warrants. Because neither the arresting officer, Summers, nor the officer who transported Shack to the jail, Officer Joey Evans, completed the necessary paperwork, there was no record of the arrest and as a

result Shack remained confined in jail without seeing a judge regarding his April 5, 2006 arrest for 104 days. Specifically, the City determined that Summers did not go to the magistrate's office to swear to the complaint in a timely fashion in violation Procedural General Order ("PGO") 511, which provides that "[t]he Officer shall be responsible for obtaining warrants in State misdemeanor cases the same working day, if possible, or the next working day the Magistrate is available."

In the course of the investigation of this incident, internal affairs discovered that another officer, Officer Robert Cole, a white male, had also arrested Shack for criminal trespass and failed to swear to the complaint in a timely fashion. While Summers received a major offense for her conduct, Cole received only a minor offense for his. Summers argues that this is evidence that her employer treated similarly situated employees who were not members of her protected class more favorably. Burke-Fowler, 447 F.3d at 1323. Unlike Summers, however, Cole twice attempted to swear to the arrest complaint at the magistrate's office, but was unable to do so because no magistrate could be found the first time and the complaint could not be found the second time. Moreover, as a result of Cole's actions, Shack remained confined in the jail for thirteen days, in comparison to the 104 days Shack remained confined after Summers arrested him. Thus, Cole's

conduct was not "nearly identical" to Summers's and he was therefore not a proper

comparator.[1]  See id.

Summers next argues that Evans, an African-American male, was also

treated more favorably than she was.  She asserted before the district court that the

_____

[1]  Summers also argues that summary judgment should not have been granted on her discrimination claims because she disputes that she actually violated PGO 511.  During the investigation of the incident, Summers stated that she followed the usual practice and did swear out a warrant for Shack.  To be sure, in Jones v. Gerwens, we said that

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

874 F.2d at 1540.  But we later clarified that the language in Jones v. Gerwens "about 'did not violate the work rule' [is] unnecessary to [that] decision . . . and [is] dicta," and we stated that

> [t]he pertinent words in Jones[ v. Gerwens] demand not two, but three elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged—either (a) disputedly or (b) admittedly—in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.

Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 n.6 (11th Cir. 1998), superseded in part, 151 F.3d 1321 (11th Cir. 1998).  We explained that "no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule."  Id.  Instead, "[t]he plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better."  Id.  Thus, we conclude that Summers cannot defeat the City's motion for summary judgment on her race and sex discrimination claims merely by attempting to dispute the City's determination that she violated the work rule.

7

"usual practice" in situations where the arresting officer does not transport the arrestee to the jail is "for the transporting officer to fill out the first part of the complaint form, attach it to the arrest report, and send it through the channels where ultimately it is posted on the 'swear board' at the magistrate's office for the arresting officer to sign." She argues that following her arrest of Shack, Evans failed to fill out the first part of the complaint, attach it to the arrest report and transmit it through the appropriate channels, but that he was not disciplined.

We agree with the district court that Evans, the transporting officer, is not an appropriate comparator because his conduct was not "nearly identical" to Summers's conduct as the arresting officer. See id. ("[W]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." (quotation marks omitted)). Even assuming that Evans violated a rule or regulation by failing to follow the usual procedures for a transporting officer, he still would not have violated the same rule Summers was disciplined for violating. As the district court observed, the City is entitled to interpret PGO 511's statement that "[t]he Officer shall be responsible for obtaining warrants" to apply specifically to the arresting, rather than transporting, officer. See Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) ("Title VII

8

does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." (quotation marks omitted)).

The second disciplinary incident resulted from Summers's failure to turn in Uniform Traffic Citations ("UTCs") within 48 hours after issuance, in violation of Rule 19 of the Alabama Rules of Judicial Administration. Rule 19(6)(a)(i) states:

> Each law enforcement officer shall complete and sign the ticket, serve a copy of the completed ticket upon the defendant, and without unnecessary delay, normally within 48 hours, acknowledge under oath the facts alleged therein before any person within the judicial branch of government who is authorized by the State of Alabama to administer oaths and file the court copies of the ticket with the court having jurisdiction over the alleged offense.

Summers issued three UTCs to motorists in Dothan on March 15, 2007. Over a month later, on or around April 17, 2007, one of the motorists went to the magistrate's office to pay the ticket, but could not because the UTC had not been turned in. An officer investigating the missing UTC discovered that Summers had the unsworn UTCs tucked into the backside of her book. As a result, Summers received a second major offense, which constituted grounds for discharge. Her employment was terminated on June 25, 2007.

In appealing her termination to the Personnel Board, Summers's merit system attorney subpoenaed the police department for the UTC records of other

police officers. As a result of that subpoena, the police department discovered and produced evidence of several violations of the 48-hour rule for UTCs by other officers, including at least one white male officer who did not turn in a UTC until six weeks after it was issued. Summers argues that this too constitutes evidence that the City treated similarly situated employees who were not members of her protected class more favorably. See Burke-Fowler, 447 F.3d at 1323.

We cannot agree that the other officers were similarly situated to Summers for the purposes of disciplinary action. Unlike Summers's misconduct, which came to light because a motorist was unable to pay a traffic ticket, the other officers' violations of the 48-hour rule were not known by the relevant decision makers until Summers's attorney subpoenaed the department's records in appealing her termination. Because the police department decision makers did not know about the other officers' prior similar acts at the time they disciplined Summers, this disparate treatment cannot be evidence of discrimination. See Jones v. Gerwens, 874 F.2d at 1542. As we have explained before, "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." Silvera, 244 F.3d at 1262.[2]

---

[2] Summers also argues that the 48-hour rule was a "sham" rule that was only enforced against her, but she cites to no authority allowing us to excuse her failure to identify appropriate comparators on this basis. We observe, however, that to the extent Summers appears to argue

Because none of the proffered employees are proper comparators to Summers, she fails to establish a prima facie case for discrimination. We conclude that the district court did not err in granting summary judgment in favor of the City on Summers's race and sex discrimination claims under Title VII and § 1981.

II.

Summers also argues that the district court erred in granting the City's motion for summary judgment with regards to her retaliation claims. She argues that her complaints of race and sex discrimination were causally connected to the adverse employment actions taken against her, and the City's reasons for the adverse actions were pretext for retaliation. Title VII prohibits an employer from retaliating against an employee for opposing an unlawful employment practice. See Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 59, 126 S. Ct. 2405, 2410 (2006). A race-based retaliation claim is also cognizable under 42 U.S.C. § 1981. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457, 128 S. Ct. 1951, 1961 (2008). To establish a Title VII or § 1981 retaliation claim, the plaintiff must show that she engaged in statutorily protected expression, she suffered an adverse employment action, and there was a causal connection

---

once again that she was not in violation of a valid work rule, she cannot establish a prima facie case of discrimination simply by disputing the violation. See Jones v. Bessemer Carraway Med. Ctr., 137 F.3d at 1311 n.6.

11

between the two events. Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008). Once a plaintiff establishes a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. Id. The plaintiff then has the ultimate burden of proving that the reason provided by the employer was a pretext for prohibited, retaliatory conduct. Id.

To establish a causal connection, a plaintiff must show that the decision-maker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated. Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." Id. at 716–17 (quotation marks omitted). Showing that an adverse employment action happens within one month of the protected activity satisfies the causation requirement for summary judgment purposes. Donnellon v. Fruehauf Corp., 794 F.2d 598, 601–02 (11th Cir. 1986). However, a three to four month period between the date of the complaints and the date of the adverse employment action, without more, is insufficient to establish causation. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Additionally, the alleged adverse employment action must follow the protected

conduct. Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1284 (11th Cir. 1999). When an employer contemplates taking a materially adverse action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation. Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006).

Here, in an attempt to show that the major offenses she received on January 18, 2007 for the Shack incident and on June 25, 2007 for failing to turn in UTCs, which combined to lead to her June 25, 2007 termination, were not wholly unrelated to protected activity, Summers points to several instances in which she argues she complained of discrimination. First, she asserts that, following her annual performance review, she complained to Chief John Powell on June 1, 2006 that she was subject to discrimination on the basis of sex.[3] Second, on January 26, 2007 she complained of race and sex discrimination when she met with the City of Dothan EEO Officer, David Thornton, regarding an investigation into discrimination complaints by another female officer. Third, she claims that she

___

[3] In the form she submitted to Chief Powell, Summers did not explicitly allege discrimination on the basis of sex or race, but did, among other things, complain that she was "not being treated equally or fairly" by her supervisors. She stated that her supervisors were indifferent to her complaints that she was put in situations "which put [her] safety and/or the safety of [her] family at risk." In her deposition, Summers explained that she was referring to her concern that police dispatchers were responding more favorably to calls for back-up from male officers than female officers.

13

complained of discrimination on June 15, 2007, when meeting with Captain Larry Draughon to request a transfer.[4]

The first two incidents—the June 1, 2006 complaints following her performance evaluation and the January 26, 2007 meeting with Thornton—are not temporally proximate enough to the adverse actions under our precedent. The June 1, 2006 complaint was lodged seven months before Summers was disciplined, on January 18, 2007, for failing to swear to an arrest complaint for Shack. Her January 26, 2007 meeting with Thornton took place only *after* she was disciplined for the Shack incident, see Drago, 453 F.3d at 1308, and five months before she was disciplined, on June 25, 2006, for failing to turn in UTCs. We have previously held that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." Thomas, 506 F.3d at 1364. The seven- and five-month periods Summers points to here are therefore not short enough to raise an inference that the adverse action was not wholly unrelated to protected activity.

---

[4] On June 12, 2007, Summers submitted to Chief Powell her request to speak with Captain Draughon about a transfer, but she did not allege discrimination on that form. Instead, she merely stated that she was "requesting the opportunity to speak with Captain Larry Draughon about a transfer to another day shift assignment and working conditions as it relates to [her] current assignment." Captain Draughon's notes from that June 15, 2007 meeting do not reflect that Summers claimed discriminatory treatment, but they do indicate that Summers claimed her supervisors "were out to get her" and that she was "still having problems with dispatchers."

14

With respect to the June 12, 2007 complaints to Captain Draughon, the time period is sufficiently proximate to the June 25, 2007 discipline for failure to turn in UTCs in time and the resulting termination, but the decision maker—Chief Powell—swears that he had no knowledge of Summers's allegations of race or sex discrimination when he made the decision to issue her a second major offense and terminate her employment. Summers argues that because Captain Draughon had a duty to report the complaint of discrimination, we should impute Captain Draughon's knowledge of the complaint to Chief Powell. We have made clear, however, that in the context of Title VII retaliation claims "neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge." Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156 (11th Cir. 2002). In other words, "mere coincidence in time [may not] raise an inference of actual knowledge where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Id. (quotation marks omitted).[5] Thus, even assuming that Summers can establish that

---

[5] For the same reason, Summers's allegations of race and sex discrimination faxed to the Equal Opportunity Employment Commission ("EEOC") on June 20, 2007 would not help her establish a prima facie case of pretext. The City did not receive notice of EEOC charge until July 3, 2007, which was eight days after Summers was terminated due to receiving a second major offense.

15

she alleged discrimination in her June 15, 2007 conversation with Captain

Draughon, we cannot impute this knowledge to the decision maker, Chief Powell.

Because Summers did not establish a prima facie case of retaliation, we

conclude that the district court did not err in granting summary judgment on

Summers's retaliation claims under Title VII and § 1981.[6]

For all of these reasons, we affirm the judgment of the district court.

**AFFIRMED.**

---

[6] The district court assumed without deciding that Summers had made out a prima facie case of retaliation, but "[t]his [C]ourt may affirm a decision of the district court on any ground supported by the record." See United States v. Fort, 638 F.3d 1334, 1337 (11th Cir. 2011).