[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-12959
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 29, 2012
JOHN LEY
CLERK

D.C. Docket No. 5:10-cv-00152-RS-EMT

JACQUELINE FINN, Estate of James
Peter Rush, as personal representative,

Plaintiff-Appellant,

versus

BOBBY HADDOCK, as Sheriff of
Washington County and individually,
JONATHAN RACKARD,
FRANK STONE, individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 29, 2012)

Before MARCUS, MARTIN and COX, Circuit Judges.

PER CURIAM:

Plaintiff, Jacqueline Finn, as personal representative of the estate of James Peter Rush, sued two Washington County Florida Sheriff's Deputies, Jonathan Rackard and Frank Stone, individually, and the Washington County Sheriff, Bobby Haddock, individually and in his official capacity, under 42 U.S.C. § 1983 for acting with deliberate indifference to Rush's serious medical need. Finn also asserted against the Sheriff claims for violations of the American with Disabilities Act and the Rehabilitation Act, as well as several state-law claims. The district court granted summary judgment to the deputies and the Sheriff on all federal claims. It then declined to exercise supplemental jurisdiction over the remaining state-law claims. Finn appeals. We affirm.

"We review a grant of summary judgment *de novo*, applying the same legal standards that bind the district court." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1222–23 (11th Cir. 2004) (citation omitted). We view the facts in the light most favorable to the non-moving party. *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004).

## I. FACTS

In 2008, James Rush was seventy-nine years old and suffered from Chronic Obstructive Pulmonary Disease ("COPD"). This condition required the use of oxygen.

One night in January, Rush called 911 fourteen times.[1] These calls primarily consisted of Rush telling the dispatcher that he was unable to find a case of beer and that he wanted someone to come talk to him. Rush told the dispatcher he feared being found on the floor in the morning. Rush never mentioned that he had COPD or that he required oxygen. Rush never requested medical assistance or stated that he had an emergency.

After Rush began calling 911, Deputy Rackard went to his home and told him to stop calling. Rackard believed Rush had been drinking. After Rush made several more calls, Rackard returned to Rush's home. He told Rush that if he continued to dial 911, he could be arrested. Unfortunately, Rush never asked Rackard to take him to the hospital or suggested that he had a serious medical condition.[2]

After Rackard's second visit, Rush kept making phone calls. Rackard then told Deputy Stone to arrest Rush. Stone arrived around 6 a.m. He tried to move Rush on his own, but Rush had difficulty standing up. Stone requested assistance from another deputy. While he waited, Rush talked constantly with Stone. Stone observed

---

[1] Rush also made some direct calls to the Washington County Sheriff's Office.

[2] Deputy Rackard never entered Rush's home. Instead, he stood in Rush's doorway. He testified in his deposition that he never saw the oxygen tanks in Rush's home (Dkt. 35-1 at 18–19), but he did see some empty beer cans (*Id.* at 10). He also testified that, while he was there, Rush got up and walked to the wall to point out some photographs. He said that Rush moved as he would expect a man of his age to move and that Rush's movements caused him no concern. (*Id.* at 19.)

several empty beer cans in Rush's home and two empty 12-pack beer cartons. (Dkt. 35-3 at 13.) Stone did not think Rush was drunk, but he smelled alcohol on his breath. (*Id.* at 21–22.) He also observed several oxygen tanks with breathing masks in another room. Neither Rackard nor Stone saw Rush using an oxygen tank.

About thirty minutes later, Deputy Gary Smith arrived and helped Stone move Rush to the patrol car. Rush appeared short of breath and had to stop on his way to the car. Even so, Rush kept talking to the deputies. After securing Rush in the back seat, Stone retrieved an oxygen tank from the house and placed it in the trunk of his car. Rush never asked that the oxygen tank be put in the back seat. The ride to the jail took about ten minutes.

When the deputies arrived at the jail, they placed Rush in a holding cell with his oxygen tank. No one was specifically assigned to watch Rush. However, the holding cell was in a high traffic area. An officer was usually within sight of Rush's cell, but that officer was sometimes absent for short periods. No one alerted the jail's medical staff about Rush's arrival.

Within twenty-five minutes, Rush passed out in his cell. Officers responded quickly, but were unable to revive Rush. He died of a heart attack caused by a lack of oxygen to the brain. An autopsy later determined that Rush's blood alcohol content was .023 at the time of his death.

## II. DISCUSSION

Qualified immunity protects government officials sued in their individual capacities "as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (internal quotations omitted)). To claim qualified immunity, a defendant must first show that he was performing a discretionary function. *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005) (citation omitted). In this case, it is undisputed that Deputies Rackard and Stone were performing discretionary functions. The burden then shifts to the plaintiff to show that: (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the violation. *Id*. at 1156 (citation omitted).

The Fourteenth Amendment prohibits state officials from acting with deliberate indifference to the serious medical needs of pretrial detainees. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1572 (11th Cir. 1985). To prevail, a plaintiff "must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann*, 588 F.3d at 1306–07 (citing *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007)).

We objectively analyze whether a plaintiff has a serious medical need. *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994).

To show deliberate indifference, a plaintiff must show that an official: (1) subjectively knew of a risk of serious harm; (2) disregarded that risk; and (3) engaged in conduct that is more than negligence. *See Farrow*, 320 F.3d at 1245 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). For an official to subjectively know of a risk of serious harm, the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994). Thus, to defeat summary judgment, the record must contain evidence that an official subjectively knew about the plaintiff's serious medical condition. *McElligott*, 182 F.3d at 1255. Subjective knowledge can be shown through circumstantial evidence. *Id.* However, "[p]roof that the defendant should have perceived the risk, but did not, is insufficient." *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citation omitted).

6

This is a tragic case. With the benefit of hindsight, we can say—and Rackard and Stone concede—that Rush faced a potentially serious medical condition. And, with the benefit of hindsight, we could speculate about what Rackard and Stone could have done differently. But we must examine what the deputies knew when they encountered Rush. *See Campbell*, 169 F.3d at 1364. If the deputies could not infer from those facts that Rush faced a serious medical condition, then they could not have inferred that Rush was in danger, much less have deliberately disregarded that risk of danger. *See Farrow*, 320 F.3d at 1245. Additionally, we must consider Rackard and Stone individually. *See Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

Finn has not shown that the deputies acted with deliberate indifference because she has not shown that either deputy was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979. Neither Rackard nor Stone had knowledge that Rush had COPD or that this condition required constant access to oxygen. Rush never told the 911 dispatcher or the deputies that he required oxygen and never asked anyone for medical assistance. While Stone saw oxygen tanks in Rush's home, he never saw Rush using it, and Rush never asked him for it.

Finn contends that Rush's need for medical assistance was obvious. She claims Rush was visibly "gasping for air" when Stone arrived.[3] (Dkt. 34 at 5.) But the uncontested video of Stone's encounter with Rush refutes Finn's allegations. In the video, Rush's breathing is shallow and frequent. But Rush is able to reposition himself while sitting. He is able to talk with Stone, and does so for nearly the entire video. When Deputies Stone and Smith escorted Rush to the patrol car, they stopped twice to allow Rush to catch his breath. However, the video clearly shows that Rush continued to talk to the deputies throughout this process. A reasonable person could conclude that Rush was having difficulty breathing. But his breathing was not so labored that it would raise immediate concern.

Thus, when the facts are view in the light most favorable to Finn, Rackard and Stone encountered an elderly and confused man who had some difficulty breathing and whom they believed had been drinking. These facts alone cannot support an inference that Rush had a serious medical condition. Difficulty breathing does not indicate a substantial risk of serious harm. It can be the result of years of smoking, a person's age, or some other non-life-threatening medical condition.

---

[3] There is no video of Deputy Rackard's encounter with Rush, and our review of the record has not disclosed what Rush's breathing looked like when Rackard encountered him.

The presence of oxygen tanks in Rush's home does not alter this conclusion. Their presence merely indicated that Rush used oxygen. It did not indicate that he required oxygen constantly, especially given the fact that the deputies never saw Rush using oxygen (over the course of a substantial amount of time) and Rush never told them that he needed it.

Rush's confusion could be explained by his age or by his perceived alcohol consumption. Finn contends the district court improperly concluded that the deputies believed Rush was drunk when, in fact, they did not. This contention overstates the district court's position. The district court noted that, under the circumstances, the deputies would have focused on alcohol consumption as the likely cause of Rush's symptoms rather than oxygen deprivation. Rush frequently referred to a lost case of beer in his 911 calls. The deputies saw several empty beer cans in Rush's home, and Stone saw two empty 12-pack beer cartons in Rush's kitchen. Though Stone did not believe Rush was drunk, he smelled alcohol on Rush's breath. Under these circumstances, the deputies could reasonably conclude that Rush's behavior was caused by his age, frailty, and alcohol consumption. Conversely, under these

circumstances, a reasonable person would not infer that oxygen deprivation was the real culprit and would soon cause Rush's death.[4]

Finn must also show that the deputies actually drew the inference that a substantial risk of serious harm existed. *See Taylor*, 221 F.3d at 1259. Because we conclude that the deputies were not aware of facts from which to draw this inference, Finn has not met her burden. In fact, the evidence shows Stone was concerned for Rush's safety. When he was unable to move Rush to his patrol car on his own, he requested assistance from another deputy. He then waited thirty minutes until Deputy Smith arrived. They braced Rush between them and carefully escorted him to the patrol car. After they put Rush in the car, Stone, without Rush asking him to do so, went back inside the house and retrieved one of Rush's oxygen tanks. He placed it in his trunk, not to keep it from Rush, but so that Rush would have it when they arrived at the jail.

Because Finn cannot show Rackard and Stone acted with deliberate indifference, the deputies were entitled to summary judgment in their favor. In her initial brief, Finn does not develop an argument regarding the Sheriff's liability under

---

[4] Because the deputies did not know that Rush needed immediate medical attention, their failure to notify the jail medical staff upon Rush's arrival was reasonable. At the very least, this failure, under these circumstances, was no more than negligent conduct.

§ 1983 in either his official or individual capacity. Therefore, Finn has waived any argument about these claims. *See, e.g.*, *Farrow*, 320 F.3d at 1242 n.10.

Finn also challenges the district court's grant of summary judgment on Rush's ADA and Rehabilitation Act claims. Finn alleges that the Sheriff violated the ADA and the Rehabilitation Act when his personnel (Rackard, Stone, and others) acted with deliberate indifference to Rush's serious medical need. Because we find the deputies would not have known about Rush's serious medical condition, and because Finn has produced no evidence that anyone at the jail knew more than the deputies knew, this argument fails.

Moreover, failure to provide adequate medical treatment (the substance of Finn's claims) does not violate the ADA or Rehabilitation Act. *See, e.g.*, *Schiavo ex. rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005); *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 121 (7th Cir. 1997); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). Thus, we affirm the district court's grant of summary judgment on these claims.

Because we affirm the district court's grant of summary judgment on Finn's federal claims, we find no error in the district court's dismissal without prejudice of Finn's state-law claims. 28 U.S.C. § 1367(c)(3).

**AFFIRMED.**