Charles FLOWERS, Plaintiff,

v.

TROUP COUNTY, GEORGIA, SCHOOL DISTRICT, et al., Defendants.

Civil Action No. 3:12–cv–152–TCB.

United States District Court, N.D. Georgia, Newnan Division.

Signed March 5, 2014.

Ruth W. Woodling, Woodlinglaw, LLC, Atlanta, GA, for Plaintiff.

Kenneth Drew Jones, Russell Alan Britt, Hall Booth Smith & Slover, P.C., Atlanta, GA, for Defendants.

### *ORDER*

TIMOTHY C. BATTEN, Senior District Judge.

This case is before the Court on Plaintiff Charles Flowers's objections to the magis-

trate judge's report and recommendation [147]. The magistrate judge recommends granting the School District Defendants'[1] motion for summary judgment on Flowers's race-discrimination claims [108], and if supplemental jurisdiction is retained over Flowers's state-law claims, the magistrate judge recommends granting Defendant Daves Nichols's motion for summary judgment [110].

## I. Standard of Review

■■■ After conducting a "careful and complete" review of a magistrate judge's findings and recommendations, a district judge may accept, reject or modify a magistrate judge's R & R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir.1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir.1982) (en banc)) (internal quotation mark omitted).[2] A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir.1990). Those portions of an R & R to which an objection is not asserted may be reviewed for clear error. *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir.1983).

Here, the magistrate judge recommends granting the School District Defendants'

motion for summary judgment.[3] This recommendation is based primarily on the following findings and conclusions:

> *First*, that contrary to the School District Defendants' contention, Flowers may establish a prima facie case of race discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), without evidence that similarly situated comparators were treated differently;
>
> *Second*, that the School District Defendants met their "exceedingly light" burden to articulate a legitimate, nondiscriminatory reason for terminating Flowers;
>
> *Third*, that the issue is whether Flowers was terminated based on an honest belief that he violated the rules against athletic recruiting, not whether he actually committed a recruiting violation;
>
> *Fourth*, that the "undisputed evidence of record" shows that Flowers was terminated based on the honestly held belief that he committed a recruiting violation; and
>
> *Fifth*, that Flowers failed to establish a jury question as to whether the School District Defendants' proffered reason for terminating him was pretext for unlawful discrimination.

Flowers timely objected to the third, fourth and fifth findings and conclusions.

---

1. Troup County, Georgia, School District, Dr. Cole Pugh, John Radcliffe, Ted Alford, Debbie Burdette, John Darden, Dianne Matthews, Alfred McNair and Sheila Row.

2. The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc). Additionally, all decisions issued after that date "by a non-unit panel of the Former Fifth, the full en banc court of the Former Fifth, or Unit B panel of the Former

Fifth Circuit" are binding precedent absent a contrary en banc Eleventh Circuit decision. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir.1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n. 4 (11th Cir. 2009) (discussing the continuing validity of *Nettles*).

3. Because the Court declines to retain supplemental jurisdiction after adopting this recommendation, the findings and conclusions re-

## II. Background[4]

The Troup County School District is a political subdivision of the State of Georgia and is governed by the Troup County Board of Education. The BOE designates an attendance zone for each district school, and students must attend the schools in which they are zoned. BOE policy and Georgia law prohibit nonresidents of Troup County from attending Troup County district schools.

In January 2010, Charles Flowers began working (without compensation) as the head coach of the Troup County High School football team. He conducted weight training and practices during that spring and summer, and on August 1, his employment contract for the 2010–2011 school year took effect. Although Troup County schools were integrated in 1973, Flowers was the first African–American head football coach of a Troup County high school. He received a second contract for the 2011–2012 school year.

Athletic coaches in Troup County are subject to two sets of rules that prohibit recruiting: the school district's Competitive Interscholastic Activities Policy (CIAP) and the Georgia High School Association (GHSA) by-laws. The CIAP is intended to be consistent with the GHSA by-laws and was adopted to provide guidance to district employees on improper recruiting activities. Both sets of rules were in place by mid-September 2010.

Starting in August 2010, the School District Defendants were contacted by school officials from the Lanett City School District about students who resided in Lanett, Alabama but were attending school in Troup County. Most communications were from Kelley Farrar, the attendance officer for Lanett City Schools. While each communication mentions several students, here it is only the residency of S. Washington and her sons (the Washington brothers) that is relevant. The communications can be summarized as follows:

August 5, 2010: Farrar sent the Troup County BOE a letter stating that he had "verified" that the Washington brothers resided in Lanett. This letter was received by Daves Nichols, who was the chair of the BOE until December 31, 2010. Nichols circulated the letter to the other BOE members.

August 11, 2010: The superintendent for Lanett City Schools sent a letter to the principal of Troup County High School explaining that the Washington brothers had been reported as living in Lanett but attending Troup County High School. The superintendent requested that they be withdrawn by August 13.

December 31, 2010: On Nichols's last day as chair of the BOE, Farrar sent him a letter. Farrar reiterates that the Washington brothers reside in Lanett but attend Troup County High School. Importantly, Farrar reveals that during his investigation he heard from parents, students and members of the community that some students were being recruited to play sports at Troup County High School. He thus informed Nichols that the Washington brothers "may or may not have been recruited."

On February 1, 2011, Cole Pugh began his tenure as the school district's superintendent. Three weeks later, he received a packet from the superintendent for Lanett City Schools explaining that his staff had been investigating reports of Lanett students attending school in Troup County. The packet contained copies of the August 5, August 11 and December 31 letters discussed above. Also enclosed was Farrar's

---

lated to Flowers's state-law claims against Nichols will not be considered.

**4.** Additional facts not relevant to the Court's review of Flowers's objections are set forth in the R & R.

August 10, 2010 letter to Ralph Swearngin, executive director of the GHSA, about the Washington brothers. That letter notes that the Washington brothers had been cleared to register at Troup County High School and would soon be submitted as eligible to play football, even though S. Washington told the principal of Lanett High School that she was neither moving to Troup County nor releasing custody of her children.

Not long after Pugh received this packet, he instructed John Radcliffe, the school district's assistant superintendent of operations, to contact the county sheriff's office for help finding a private investigator to look into the Lanett school officials' allegations.

In April 2011, Duke Blackburn was hired to investigate, among other things, where the Washington brothers resided. Blackburn in turn provided the school district a two-step investigation proposal: first, he would ascertain whether students who resided in Alabama were attending Troup County schools (as had been alleged); and second, he would determine whether any district employee, specifically a coach, aided or coerced these students and their families to misrepresent their true residency in order to participate in athletic programs. Recognizing the time-sensitive nature of the investigation, he stated that both investigations would be completed by early May. The proposal was approved by Radcliffe, who served as Blackburn's primary point of contact.

In early May, Blackburn submitted an initial investigation report. He stated that he had not uncovered any evidence of Troup County employees helping students establish fraudulent residency. He also stated that he still had some questions about whether the Washington brothers should be considered residents of Troup County.

Two months later Blackburn emailed Radcliffe specifically about the Washington brothers.[5] This email contained a reference to Ric Hunt, the co-owner of Happy Hallow Apartments, the complex into which S. Washington and her sons moved in February 2011.[6] The next day Blackburn filed a report that included details of his discussion with Hunt. According to Hunt, Flowers called him looking for a place where the Washington brothers could live so that they could continue to play football for Troup County High School.

A month passed, and Blackburn emailed Radcliffe again. Blackburn confirmed Hunt's willingness to cooperate with any investigation of Flowers and reported that, according to Hunt, Flowers had guaranteed payment for the apartment S. Washington rented, after her application was denied for poor credit.

Finally, on September 22, 2011, a month after Blackburn's last email to Radcliffe and more than four months after his initial report, Pugh and Radcliffe met with Hunt. During this meeting, Hunt reiterated that Flowers had called him and paid the deposit and rent for the apartment in which S. Washington and her sons resided during the previous school year.[7]

---

5. This email also advised Radcliffe that S. Washington and her children had been evicted from Happy Hallow Apartments for non-payment of rent.

6. This was their second residence within the Troup County High School attendance zone. The first one was located at 904 Avenue D.

7. The Washington brothers did not play football in Troup County during the 2011–2012 school year.

Several months passed. On January 19, 2012, Pugh instructed Radcliffe to obtain a signed statement from Hunt about Flowers's efforts to allegedly obtain housing for the Washington brothers at Happy Hallow Apartments.

Armed with this statement, Pugh and Sequita Freeman, the school district's chief human resources officer, met with Flowers on February 16, 2012. Pugh informed Flowers that he was being terminated for violating the CIAP and GHSA by-laws' prohibitions on recruiting by helping the Washington brothers and their mother to obtain housing within the Troup County High School attendance zone.

The next day, Flowers returned to Pugh's office with Tseyonka Davidson (one of the Washington brothers' uncles) and his wife. Davidson provided Pugh with a signed statement attesting that he had paid the deposit and rent for the apartment. He also informed Pugh that he, not Flowers, had made the phone call to Hunt about securing the apartment. To back up Davidson's story, Flowers provided Pugh with a statement from the resident manager of Happy Hallow Apartments, who declared that Davidson and S. Washington had paid the deposit and rent.

Even though his termination was not yet final, and despite the evidence indicating that Hunt's statement was false, Pugh did not relent. Flowers was paid through the end of the month and then officially terminated.

Six months later, Flowers filed a race-discrimination suit against the School District Defendants. At the same time, he sued Nichols for intentional interference with contractual relations and slander under Georgia law.

After discovery closed, the School District Defendants and Nichols moved for summary judgment. The magistrate judge recommends granting both motions, assuming that supplemental jurisdiction over the state-law claims against Nichols is retained.

## III. Race Discrimination Under Title VII, §§ 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment

Flowers asserts that the School District Defendants treated him disparately because he is African–American, thereby violating Title VII, 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment.

■■ Title VII makes it unlawful for employers to hire, fire or otherwise discriminate against their employees regarding "compensation, terms, conditions, or privileges of employment" on the basis of race. 42 U.S.C. § 2000e–2(a)(1). Section 1981 grants "[a]ll persons within the jurisdiction of the United States" an equal right "to make and enforce contracts" free from racial discrimination. Race-discrimination claims levied against state actors, like the School District Defendants, must be brought under § 1983. *Butts v. County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000). The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny any person within its jurisdiction the equal protection of the law." Individuals thus have a constitutional right to be free from race-based employment discrimination by public officials, *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir.2003), and violations of this constitutional right are enforced under § 1983, *see Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir.1980).

■ Disparate-treatment claims under Title VII, §§ 1981 and 1983, and the Equal Protection Clause that rely on the same set of facts are analyzed under the Title VII analytical framework. *See Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949

(11th Cir.1991) ("[T]he test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment causes."); *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir.2008) ("[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."); *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation,* 49 F.3d 1490, 1508 (11th Cir.1995) ("When section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000e–2], the elements of the two causes of action are the same." (alteration in original) (quoting *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir.1982)) (internal quotation marks omitted)). Flowers's race-discrimination claims will thus be analyzed together under the Title VII framework.

To succeed in this Title VII action, Flowers must prove that the School District Defendants intentionally discriminated against him on the basis of race. *Walker v. NationsBank of Fla., N.A.,* 53 F.3d 1548, 1557 (11th Cir.1995). Intentional discrimination based on disparate treatment is a question of fact that may be established through either direct or circumstantial evidence. *Underwood v. Perry Cnty. Comm'n,* 431 F.3d 788, 793 (11th Cir.2005). Because Flowers relies on circumstantial evidence, the analysis of his discrimination claims proceeds under the familiar burden-shifting framework established in *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and their follow-on cases. Under that framework, the burden of production shifts back and forth between Flowers and the School District Defendants, but the burden of persuasion always falls on Flowers. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. That is, the ultimate question remains "whether [Flowers] was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Flowers bears the initial burden of establishing a prima facie case of race discrimination. *Evans v. McClain of Ga., Inc.,* 131 F.3d 957, 963 (11th Cir.1997). This is not an onerous burden; indeed, it merely requires that he "establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). If he succeeds, then "a legal presumption of unlawful discrimination arises and the burden shifts to the [School District Defendants] to articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Evans,* 131 F.3d at 963. Their burden, however, is one of production rather than persuasion and is "exceedingly light." *Smith v. Horner,* 839 F.2d 1530, 1537 (11th Cir.1988). Indeed, to meet it they need only offer " 'a clear and reasonably specific' non-discriminatory basis" for firing Flowers. *Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 770 (11th Cir.2005) (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089).

If the School District Defendants meet their burden, "the presumption of discrimination created by the *McDonnell Douglas* framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.' " *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997) (quoting *Burdine,* 450 U.S. at 255 & n. 10, 101 S.Ct. 1089). At this point, Flowers's burden under the *McDonnell Douglas* framework—rebutting the proffered reason—"merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. For purposes of summary judgment, how-

ever, "the question becomes whether the evidence, considered in the light most favorable to [Flowers], yields the reasonable inference that the [School District Defendants] engaged in the alleged discrimination." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir.2011).

## IV. Objections to the R & R

 No party objects to the magistrate judge's conclusions that Flowers established a prima facie case without providing a similarly situated comparator and that the School District Defendants articulated a legitimate, nondiscriminatory reason for terminating Flowers. Neither conclusion is clearly erroneous, so they are adopted.[8]

Flowers objects to the magistrate judge's findings and conclusions on the issue of pretext. In his opposition brief, he contends that summary judgment is improper for three reasons:

First, a genuine dispute exists about whether he actually committed a recruiting violation;

Second, the School District Defendants' reason for firing him is unworthy of credence because Pugh offered inconsistent reasons for his termination; and

Third, two similarly situated comparators—Caucasian head football coaches who were accused of recruiting—were neither investigated nor disciplined.[9]

After reviewing Flowers's proffered evidence, the magistrate judge concluded that he had not established a jury question on the issue of pretext. At bottom, this conclusion rested on a factual finding: at the time of the termination meeting in February 2012, Pugh honestly—even if mistakenly—believed that Flowers had committed a recruiting violation. The warrant for this (possibly mistaken) belief was Hunt's statement that Flowers had not only contacted him about securing an apartment for the Washington brothers but also offered to pay the deposit and rent.

 Flowers identifies three specific errors in the R & R: the magistrate judge (1) improperly disregarded evidence that establishes pretext, (2) impermissibly made credibility determinations and drew inferences in favor of the School District Defendants, and (3) incorrectly applied the applicable legal standards to his evidence. Given the interrelated nature of these objections, it is appropriate to review the issue of pretext de novo.

---

8. As this Court has noted, some Eleventh Circuit opinions seem to "establish a one-size-fits-all criteria for the prima facie case," but this view is inconsistent with *McDonnell Douglas* itself and the primary purpose of the prima facie case requirement. *King v. Ferguson Enters., Inc.*, 971 F.Supp.2d 1200, 1213–14, No. 11–cv–1901–TCB, 2013 WL 5201547, at *8 (N.D.Ga. Sept. 17, 2013). Indeed, *"McDonnell Douglas* neither requires proof of a comparator nor provides the only way for plaintiffs to use circumstantial evidence to survive summary judgment." *Id.* at 1216, 2013 WL 5201547 at *11. This view is supported by well-established circuit precedent. "A prima facie case of discriminatory discharge may be established in different ways. One way is ...: if [a member of a protected

class] establishes that he was qualified for the job, but was fired and replaced by someone outside the protected class." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir.1984). Thus, the magistrate judge correctly concluded that Flowers established a prima facie case: he is African–American; he was fired; he was qualified; and he was replaced by a Caucasian.

9. Flowers also mentions other comparators in his opposition brief. But his objections to the R & R focus solely on the Caucasian head football coaches. Because the conclusion that the other comparators are not similarly situated is not clearly erroneous, it is affirmed.

## V. Whether Summary Judgment Is Appropriate

Summary judgment is proper when no genuine issue about any material fact is present, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. And "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Here, because the School District Defendants have rebutted the presumption of discrimination, Flowers's ultimate burden—proving by a preponderance of the evidence that he was the victim of race discrimination—merges with his burden of showing that that the School District Defendants' proffered reason for his termination was merely pretext for racial discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. This would be his burden at trial.

On summary judgment, Flowers's burden is to present "sufficient evidence" that a jury question exists about whether the proffered reason for his termination was pretextual. *Combs*, 106 F.3d at 1529. His evidence must "demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action," thus allowing a reasonable jury to infer that unlawful discrimination was the real reason. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1279 (11th Cir.2008); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) ("A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination.").

Put plainly, because of the merger of pretext and his ultimate burden, Flowers can survive summary judgment "(1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998). And to make this showing he can either introduce new evidence or rely on

the evidence that established the prima facie case. *Combs*, 106 F.3d at 1528.

This case is a prime example of when additional evidence is required; the four facts that established the prima facie case are not enough. But not all evidence is material; materiality is determined by the governing law. Here, therefore, evidence is material only insofar as it helps establish (1) that the School District Defendants' proffered reason is pretext and thus unworthy of credence, *Rioux*, 520 F.3d at 1279; (2) that similarly situated comparators were treated more favorably, *Nix*, 738 F.2d at 1186; or (3) "a convincing mosaic of circumstantial evidence" from which a reasonable jury could conclude that race discrimination was the reason for Flowers's termination, *Smith*, 644 F.3d at 1328.

### A. Evidence of Pretext

██ Flowers's first and second objections principally take aim at the magistrate judge's finding that Pugh honestly believed that Flowers had committed a recruiting violation when he fired him on February 16, 2011. He contends that this finding omits certain material facts, namely, facts contained in several affidavits about where the Washington brothers resided. In his view, these affidavits should have been considered because "they not only establish that the conclusions of the [School District Defendants'] investigation of [him] were wrong, but that the investigation was phony and a setup. These affidavits not only plainly demonstrate that [he] did not engage in recruiting, but how easy it was to establish that fact." He also claims that the magistrate judge impermissibly made credibility determinations and drew inferences in favor of the School District Defendants.

All told, Flowers mounts a three-front attack on the credibility of the proffered reason. His first approach is to show that a genuine dispute exists over whether he committed a recruiting violation. His second approach is to raise questions about the legitimacy of the School District Defendants' investigation of him. His third approach is to attack the consistency of Pugh's explanations for his termination. No approach, however, succeeds in satisfying his burden to "meet [the proffered] reason head on and rebut it" without "simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000) (en banc).

### 1. Whether Flowers Committed a Recruiting Violation

Flowers ascribes considerable importance to whether he actually committed a recruiting violation. For example, in his opposition brief, he posits that because he was fired for allegedly violating a work rule, he can prove pretext by "showing . . . that he did not violate the work rule." To support this claim he offers only a general citation to *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987). Additionally, in his objections to the R & R, he contends that where the Washington brothers resided is "of critical importance." In his view, "even if he did talk to Ric Hunt on the telephone about finding an apartment for them at Happy Hallow Apartments"—which he vehemently disputes—helping them "find a residence" in the Troup County High School attendance zone does not constitute recruiting because they already resided in the school's attendance zone.

The magistrate judge implicitly rejected Flowers's claim that he could establish pretext by simply showing that he did not commit a recruiting violation, and Flowers does not specifically object to this conclusion. Yet whether *Sparks* is controlling demands an explicit analysis. If it is, then facts touching on whether Flowers actually committed a recruiting violation are mate-

rial and should have been considered. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Like Flowers, Sparks established a prima facie case by showing that she was replaced by a person outside of her protected group. And like the School District Defendants, the employer's legitimate, nondiscriminatory reason for firing her was the violation of a work rule. Under these circumstances, the court held that "the employee must prove pretext by showing either that she did not violate the work rule, or that if she did, other employees not within the protected class who engaged in similar acts were not similarly treated." 830 F.2d at 1563. Although Flowers's opposition brief does not specifically cite this portion of *Sparks,* this is the rule he intended to reference.

*Sparks,* however, is distinguishable on its facts. Unlike the School District Defendants, the employer in *Sparks* had personal knowledge of the underlying conduct that gave rise to the alleged work-rule violation. Indeed, the evidence at summary judgment indicated that the employer concluded that a violation occurred based on a never-before-used construction of an *unwritten* work rule. These facts, the court held, could allow a reasonable jury to conclude that this explanation was implausible and unworthy of credence.

■■■ A different rule applies when an employer determines that a violation occurred without personal knowledge of the putative violation. In that case the question is whether the employer honestly believed that a violation occurred, not whether the employee actually committed the violation. *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991). And this rule applies here.

In this circuit, it is not what Flowers actually did or whether Hunt was telling the truth that matters. What matters is whether Pugh fired Flowers based on an honest belief that Flowers had violated the recruiting rules. To be blunt, Pugh's belief can be dead wrong, but so long as it was honestly held, then Flowers's race-discrimination claims cannot succeed.[10] *See Alvarez v. Royal Atl. Developers,* 610 F.3d 1253, 1266 (11th Cir.2010) ("The inquiry into pretext centers on the employer's beliefs, . . . not on reality as it exists outside of the decision maker's head."). And because Flowers challenges the veracity of the proffered reason, "[the] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Kragor v. Takeda Pharm. Am., Inc.,* 702 F.3d 1304, 1310–11 (11th Cir.2012) (alteration in original) (quoting *Elrod,* 939 F.2d at 1470) (internal quotation marks omitted). The fairness or prudence of that decision is irrelevant. *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999). In the end, Pugh "may fire [Flowers] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix,* 738 F.2d at 1187.

---

**10.** As the R & R notes, it is well established in this circuit that when an employer fires an employee under the honest but mistaken belief that the employee violated company policy, race was not the reason for the discharge. For example, in a race-discrimination action under Title VII and § 1981, the Eleventh Circuit held that the following jury instruction was adequate, meaning that "the jury understood the issues and the controlling law and was not misled in any way":

> [I]f an employer discharges an individual under an honest belief pursuant to the information available to the employer that the employee has violated a policy of the employer, the fact that the employer's belief may be mistaken or wrong in fact does not mean that such belief cannot constitute a legitimate reason for the employer's discharge of the plaintiff.
>
> *Smith v. Papp Clinic, P.A.,* 808 F.2d 1449, 1452–53 (11th Cir.1987).

So even assuming that Flowers did not commit a recruiting violation, he fails to demonstrate pretext unless the sincerity of Pugh's belief is called into question. And to do that, he cannot simply dispute that a violation occurred because Pugh based his decision on Hunt's statement rather than on personal knowledge.[11] *See Vessels,* 408 F.3d at 771.

### 2. The Legitimacy of the School Board Defendants' Investigation

Flowers also attempts to call into question the sincerity of Pugh's belief by challenging the legitimacy of the investigation of him. He characterizes this investigation as "phony and a setup." As proof he offers the following.

The initial investigation report found no evidence that Flowers had helped students establish fraudulent residences. But the investigation of Flowers did not stop. It continued until Hunt, co-owner of the complex where S. Washington and her sons last resided, was found. According to Hunt, Flowers called looking for a place where the Washington brothers could live and continue to play football at Troup County High School and that Flowers said he would pay the deposit and rent. Yet the evidence—documents, affidavits and deposition testimony—reveals that Hunt spoke to Davidson, one of the Washington brothers' uncles, from his cellphone and that the deposit and rent were paid by Davidson and S. Washington.

Flowers also points out that the School District Defendants waited nearly five months after their meeting with Hunt to terminate him, even though his violation was so serious that he was terminated without receiving a warning.[12] During this time, no attempt was ever made to ask him about Hunt's allegations.

Considerable evidence proves that the Washington brothers resided in the Troup County High School attendance zone: first at 904 Avenue D and then at Happy Hallow Apartments. For example, Troup County High School itself twice determined that the boys lived at 904 Avenue D. In fact, had they been asked, many people, including school-district employees, could have confirmed where the Washington brothers resided.

Flowers argues that despite being presented with substantial evidence that he did not call Hunt or pay the deposit and rent for S. Washington's apartment, Pugh refused to reverse his termination, which did not take effect until February 29. Instead, Pugh "continued to fish for grounds to terminate Flowers even after Flowers produced substantial evidence that he hadn't violated the recruiting policies of either the District or the State."

According to Flowers, after the February 16 meeting Pugh's reason for terminating Flowers shifted. Pugh began to rely on Flowers's admission during their meeting that he had called Hunt. (Neither

---

**11.** Flowers's contention that no recruiting violation could occur if he called Hunt to help the Washington brothers "find a residence" at Happy Hallow Apartments because they already resided in the Troup County High School attendance zone is a red herring. Even if he were correct, this would not be evidence that Pugh did not honestly believe that making such a call (even without offering to pay the deposit and rent on the apartment) was a recruiting violation. Nor does it accurately reflect the facts: Hunt told Pugh not

only that Flowers called to find a residence for the Washington brothers but also offered to pay the deposit and rent on that residence. Whether Hunt's statement is true is beside the point.

**12.** The School District Defendants admit that prior to Flowers no district employee had ever been fired without first receiving a warning except for violations of the drug or sexual-misconduct polices.

party disputes that Flowers denied paying the deposit and rent.) But it is doubtful that Flowers admitted to making this call. First, no notes of the meeting were taken. Second, Freeman, who joined Pugh at the meeting, testified that she did not remember the details of the meeting, but in a subsequent affidavit she stated that Flowers denied paying rent but admitted calling Hunt. Freeman's "enhanced recollection" creates a credibility question and is evidence of pretext.

Finally, Flowers points out that a few days after the February 16 meeting, Pugh called Swearngin, GHSA's executive director, to confirm that making a call to secure an apartment for an athlete would be considered recruiting. Pugh testified that Swearngin said it would. But in his affidavit Swearngin states that he never "makes decisions with regard to the application of the Constitution and By–Laws of the GHSA by telephone." According to Flowers, this discrepancy not only creates an issue of fact that precludes summary judgment but also shows that Pugh did not honestly believe that he had committed a recruiting violation.

### a. Evidence of Conduct Before February 16, 2012

Flowers has not persuasively challenged the legitimacy of the School District Defendants' investigation. The holes that he attempts to point out either do not exist or are too small to raise a jury question on the issue of pretext. In their proper context, the facts indicate that the investigation of him was not "phony or a setup." To the contrary, the decisions made during the investigation are those of a reasonable employer. That Flowers, or any other reasonable person, would have taken different actions or made different decisions is not evidence of pretext. The Eleventh Circuit has made clear that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where . . . the reason is one that might motivate a reasonable employer." *Combs,* 106 F.3d at 1543.

To be sure, the private investigator's initial report found no evidence that any Troup County employee had helped students obtain fraudulent residences in order to participate in an athletics program. But this report also notes that unresolved questions about the residences of some children, including the Washington brothers, remained. As a result, it is hardly surprising that the investigation continued.

Flowers next suggests that if the investigation was designed to simply determine where the Washington brothers resided, there were a lot of people who could have been questioned but were not. While true, this does not mean that the investigation was a sham. Indeed, a review of the notes attached to the investigator's July 20, 2011 executive summary indicate just the opposite. From July 13–19, the investigator looked into where S. Washington worked as well as whether the Washington brothers resided at Happy Hallow Apartments. As part of his investigation, he received Hunt's contact information and left a message for him. Hunt returned the investigator's call and stated that Flowers had called to secure a place in which the Washington brothers could reside and promised that the deposit and rent would be paid. Indeed, Hunt claimed that Flowers had paid the deposit by check. Hunt also told the investigator that S. Washington and her sons had recently moved out.

Even if Hunt's statements were incorrect, it was not unreasonable for the School District Defendants to rely on them. Nor was there any reason for the School District Defendants to confirm Hunt's statements with, for example, the resident apartment manager who worked for Hunt. Again, the fact that Flowers or

another reasonable person would have inquired further is not evidence of pretext. This Court is not permitted to sit in review of the business decisions of employers, including how they investigate alleged work-rule violations, absent evidence of a discriminatory motive. "This is true '[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers.'" *Alvarez*, 610 F.3d at 1266 (quoting *Chapman*, 229 F.3d at 1030 (quotation marks and citations omitted)).

Flowers's next move is to criticize the School District Defendants' decision to wait almost five months to terminate him, even though his conduct was allegedly so severe that no warning was given. He also notes that during this period no one asked him about the allegations. Pugh testified that because the 2011–2012 football season had already begun when he met with Hunt (on September 22, 2011), he decided to delay any action against Flowers. This decision is one that a reasonable employer could make. In addition, nothing in the record suggests that the School District Defendants were required to give Flowers a warning or to ask him about the allegations before firing him. These facts are mentioned in an attempt to show that Flowers was treated disparately. But being treated differently is not enough to avoid summary judgment; Flowers must show that a similarly situated comparator was treated differently.

In sum, Flowers has presented no evidence that calls into question the sincerity of Pugh's belief that Flowers had committed a recruiting violation as of the February 16, 2012 termination meeting. Thus, Flowers has failed to present any evidence from which a reasonable jury could conclude that the proffered reason was pretext for race discrimination.

### b. Evidence of Conduct on and After February 16, 2012

It is undisputed that Pugh informed Flowers that he was fired at their February 16 meeting. Nor is it disputed that Flowers denied that he paid the deposit and rent on S. Washington's residence at Happy Hallow Apartments. What is disputed is whether during that meeting Flowers admitted to calling Hunt. On summary judgment, this factual dispute must be resolved in favor of Flowers.

But even assuming that he denied recruiting in any way, Pugh's refusal to reverse his decision is not by itself evidence of pretext. Whether the evidence presented to Pugh after the February 16 meeting should have persuaded him to reverse his decision raises questions of factual correctness, fairness and prudence. These questions, however, are not within the Court's purview. *Damon*, 196 F.3d at 1361.

Although Flowers's proffered evidence raises a few factual disputes, the disputed facts are not material. In the end, it is irrelevant whether he actually committed a recruiting violation or whether another reasonable person would have conducted the investigation differently. Based on the proffered evidence, no reasonable jury could find that Pugh did not honestly believe that Flowers had committed a recruiting violation when he fired him on February 16. Nor could a reasonable jury conclude that Pugh's refusal to reverse his decision was because Flowers is African-American. Accordingly, Flowers has failed to raise a jury question on the issue of pretext.

### 3. Pugh's Allegedly Inconsistent Statements

Flowers can establish pretext by offering evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the] proffered legitimate reasons for [his termination] that a reason-

able factfinder could find them unworthy of credence." *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir.2004). He claims that Pugh provided inconsistent reasons for firing him:

> *First*, in his answers to interrogatories, Pugh states that he fired Flowers for violating the CIAP and the GHSA by-laws by assisting the Washington brothers in obtaining a residence within the Troup County High School attendance zone.
>
> *Second*, during his deposition, Pugh testified that he was not sure whether Flowers had violated the CIAP but that he contacted Swearngin to confirm that if someone made a call to secure an apartment for an athlete, this would constitute recruiting. Swearngin answered in the affirmative.

In addition to being inconsistent, Flowers asserts that there is a disputed issue of fact about whether Pugh actually received an affirmative answer from Swearngin, who never "makes decisions with regard to the application of the Constitution and By-Laws of the GHSA by telephone."

Pugh's statements are not inconsistent. His first statement refers to his reasons for firing Flowers prior to February 16: a belief that Flowers violated the CIAP and GHSA by-laws' prohibitions on recruiting. His deposition testimony refers to the period *after* the February 16 meeting. Pugh testified that Flowers admitted during the meeting to calling Hunt but denied that he paid the deposit or rent. Pugh's question to Swearngin—which Flowers does not dispute he asked—concerned whether such a call itself would constitute recruiting. As the magistrate judge correctly noted, Pugh called Swearngin merely to verify his belief that Flowers had committed a re-

cruiting violation. Considered in their proper context, Pugh's statements are not fundamentally inconsistent and thus do not create a jury question on the issue of pretext. *See Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir.1998) (holding that additional, undisclosed, nondiscriminatory reasons for firing an employee are not evidence of pretext).

Further, even if Swearngin's affidavit created an issue of fact about whether he told Pugh that making a call to secure a residence for an athlete could constitute recruiting—a conclusion that is far from obvious because he does not dispute that Pugh called or discuss their conversation at all—this fact would be immaterial because Pugh's statements are not fundamentally inconsistent. Thus, Flowers has failed to produce evidence from which a reasonable jury could conclude that the proffered reason for his termination—violating the recruiting rules—was pretext.

**B. Similarly Situated Comparators**

In his third objection, Flowers asserts that the magistrate judge applied "a standard [not] applied by the Eleventh Circuit" when determining whether an employee is similarly situated: "that [his] comparators be exactly the same." Presumably, he believes that this error occurred because of the R & R's reliance on nonprecedential decisions, which his brief devotes several pages to discussing. Then, with a hint of irony, he cites the Eighth Circuit's decision in *Burton v. Arkansas Secretary of State*, 737 F.3d 1219 (8th Cir.2013), as support for his preferred construction of the similarly situated test: "The similarly situated co-worker inquiry is a search for a substantially similar employee, not a clone." [13]

---

**13.** This quote from Flowers's objections to the R & R is itself a direct quote of *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013), *quoted in Burton*, 737 F.3d at 1231.

The original source of this quote, as *Ridout* and *Burton* acknowledge, is the Seventh Circuit's decision in *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir.2010).

With that said, the first step is to ascertain the law in this circuit governing when a comparator is similarly situated.

"Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts." *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1265 (11th Cir.1996). Where, as here, discriminatory discipline is alleged, "[t]he most important variables ... are the nature of the offenses committed and the nature of the punishments imposed." *Jones v. Gerwens*, 874 F.2d 1534, 1539–40 (11th Cir.1989) (alteration in original) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir.1985)) (internal quotation marks omitted). The plaintiff's burden is to show that a comparator is "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562. This requires courts to consider "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* In order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges," *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir.2001), the "comparator must be *nearly identical* to the plaintiff," *Wilson*, 376 F.3d at 1091 (emphasis added).[14] And this occurs only if "the quantity and quality of the comparator's misconduct is nearly identical." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).

Flowers offers Donnie Branch and Pete Wiggins as comparators. Both men are Caucasian and were head football coaches in the school district during his tenure.

He contends that the magistrate judge erred by concluding that they were not similarly situated. The three coaches had the following in common: they had the same job; they performed the same duties; they had the same supervisor; and they were all accused of recruiting football players. This makes them, in Flowers's eyes, "obviously all apples."

But are they? In this circuit employees can work for the same employer, have the same job, allegedly violate the same work rule, yet not be deemed similarly situated. *See, e.g., Burke–Fowler*, 447 F.3d at 1325. In that case, the county fired Burke–Fowler, an African–American correctional officer, for fraternization with an inmate. She sued the county for, among other things, race discrimination. After the district court granted summary judgment to the county, she appealed. *Id.* at 1322.

On appeal, Burke–Fowler argued that summary judgment was improper because she established a prima facie case and showed that the proffered reason was pretext. As support, she pointed to four Caucasian correctional officers who were not fired even though they either violated or allegedly violated the same anti-fraternization policies. Looking beyond the surface similarities between her and the comparators—that they were county correctional officers who had at least allegedly violated the same polices—to the nature of the alleged violations, the Eleventh Circuit held that "[n]one of them are appropriate comparators." *Id.* at 1325. Burke–Fowler had pursued a romantic relationship with an inmate who had recently left her

---

**14.** To the extent Flowers contends that comparators are not evaluated under a "nearly identical" standard, such a contention has no basis in circuit precedent. The nearly identical requirement has been a staple of the circuit's Title VII case law since at least 1982. *See Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982) (holding that to establish similarly situated comparator the Title VII plaintiff had to show "that the misconduct for which she was discharged was *nearly identical* to that engaged in by a male employee whom [her employer] retained" (emphasis added)).

direct supervision. Conversely, two of the comparators never had a romantic relationship with an inmate. But the others did. Yet their misconduct was not "nearly identical" to hers because those relationships began *before* the inmates were incarcerated. *Id.*

 *Burke–Fowler* helps explain Flowers's contention that each coach was accused of the same type of recruiting violation: "facilitating the participation of football players in playing football outside their attendance zones." But the facts belie this attempt to pigeonhole the alleged violations. More importantly, however, they reveal that the nature and quality of their alleged misconduct were different.

Branch allegedly had a meeting with a student who lived in another attendance zone during which he expressed an interest in having the student play for him, stated that the student would be highly recruited if he played safety or outside linebacker, but offered the student a chance to play any position he wanted. Wiggins allegedly not only knew that a student lived in an adjacent county but also transported him to his out-of-zone residence on many occasions. Further, Wiggins allegedly gave expensive equipment to the student and provided him with cash a couple of times a week. Flowers allegedly assisted students in securing a residence within the Troup County High School attendance zone by paying the deposit and rent for the apartment where they lived.

*Burke–Fowler* establishes that not all violations of the same work rule have the same nature or quality. But it does not explain how courts are to ascertain these differences; instead, the court simply asserts that the comparators' conduct was not "nearly identical" after recounting the facts of their alleged violations. Even so, it is unlikely that the court's conclusion was purely factual. Rather, the better

explanation is that how Burke–Fowler and her comparators violated the anti-fraternization policies affected the nature and quality of their misconduct. In the end, for a comparator to be similarly situated, the nature and quality of the violation— not how it is committed—must be nearly identical.

Here, like the anti-fraternization polices in *Burke–Fowler,* recruiting violations under the CIAP and GHSA by-laws can occur in myriad ways. This implies that the nature and quality of recruiting violations fall along a spectrum and that coaches who allegedly commit such violations may not be similarly situated comparators—even if they have the same job, duties and supervisor. That is the case here.

First, the monetary value to the students and their families of the alleged misconduct is different. Flowers allegedly provided more than $1,500 of support—the deposit and rent for an apartment. While Wiggins allegedly provided some monetary benefits (transportation, equipment and cash), the value is unknown. Branch is not alleged to have offered anything of monetary value. Thus, in terms of monetary value, Flowers's alleged misconduct is not "nearly identical" to that of Branch and Wiggins.

Second, all attempts to woo an athlete are not equal; some are more likely to succeed than others. Branch allegedly made promises of collegiate recruitment and autonomy, and in some cases such promises may work (though not for Branch, as the student he allegedly recruited did not actually play for him). Wiggins allegedly offered transportation, equipment and cash. Such benefits are more likely to succeed than bare promises because they mitigate some of the difficulties associated with playing a sport outside of the proper attendance zone. Flowers allegedly helped two students and their mother secure an in-zone residence by

paying the deposit and rent on an apartment. Of the three this is the most likely to succeed. Thus, in terms of the likelihood of success, Flowers's alleged misconduct is not "nearly identical" to that of Branch and Wiggins.

Finally, once students are successfully recruited, the risk of detection varies with the misconduct. For example, coaches who recruit students by transporting them to their out-of-zone residences (like Wiggins allegedly did) confront a higher risk of detection than coaches who recruit students by helping them secure in-zone residences (like Flowers allegedly did). One reason for this is that different types of investigation are needed to ferret out the violation. For instance, proof that a coach transported a student to his or her out-of-zone residence may be enough to take action, but proof of transportation to an in-zone residence almost certainly is not. As a result, in terms of the risk of detection, Flowers's alleged misconduct is not "nearly identical" to that of Wiggins.

Flowers's alleged misconduct could likely be distinguished in other ways as well. Yet the foregoing discussion sufficiently establishes that Branch and Wiggins are not similarly situated comparators because their alleged misconduct is not "nearly identical" to his. So the fact that they were subject to different types of investigations or disciplinary actions is irrelevant for purposes of establishing pretext. Consequently, Flowers has failed to raise a jury question on the issue of pretext.

### C. A Convincing Mosaic of Circumstantial Evidence

Although Flowers has failed to show that the School District Defendants' proffered reason is unworthy of credence or that similarly situated comparators were treated more favorably than he, Flowers can still survive summary judgment by establishing "a convincing mosaic of circumstantial evidence" that would allow a reasonable jury to infer that he was the victim of racial discrimination. *See Smith,* 644 F.3d at 1328. In other words, his race-discrimination claims "survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

He has failed to meet this burden. Unlike in *Smith,* where considerable circumstantial evidence suggested that race played a prominent role in the termination decision, Flowers has not adduced comparable evidence. To the contrary, most of the evidentiary tiles he proffers were discarded as insufficient or irrelevant in considering his other arguments against summary judgment. These tiles cannot now be reassembled to create a convincing mosaic of discriminatory intent. Put differently, even after drawing all reasonable inferences in favor of Flowers, no reasonable jury could conclude that he was fired because he is African–American. Accordingly, the School District Defendants' motion for summary judgment on his race-discrimination claims will be granted.

### VI. Supplemental Jurisdiction over the State–Law Claims Against Nichols

Once all claims over which a district court has original jurisdiction have been dismissed, the court may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3). In deciding whether to retain supplemental jurisdiction, "a federal court should consider, and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)) (internal quotation marks omitted).

The Supreme Court has recognized that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n. 7, 108 S.Ct. 614. Consequently, the Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004).

Nichols encourages the Court to exercise supplemental jurisdiction even though the federal claims will be dismissed. He asserts that because the dismissal of the federal claims occurred after discovery, motions for summary judgment, and an R & R, it would be unfair to dismiss without prejudice the state-law claims against him this late in the game. Indeed, he posits that trial is just around the corner and that to say this case is in the " 'early stages of litigation' is laughable."

 Nichols's invitation to exercise supplemental jurisdiction is declined. This is a typical case. Indeed, district courts often decline to exercise supplemental jurisdiction after dismissing federal claims on summary judgment. *See, e.g., Estate of Rush v. Haddock*, No. 5:10–cv–152/RS–EMT, 2011 WL 2199718, at *6 (N.D.Fla. June 6, 2011), *aff'd*, 459 Fed.Appx. 833 (11th Cir.2012); *Wright v. Sanders Lead*

*Co.*, No. Civ. A. 2:05CV371–ID, 2006 WL 905336, at *11 (M.D.Ala. Apr. 7, 2006), *aff'd*, 217 Fed.Appx. 925 (11th Cir.2007). Further, while Flowers may decide to pursue his claims in state court, Nichols has not suggested that this will be especially unfair to him; that is, he offers no reason to think that this is in any way unusual. Lastly, issues of Georgia law should be decided by state courts where possible. *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir.1997). For these reasons, "the values of judicial economy, convenience, fairness, and comity" weigh in favor declining to exercise supplemental jurisdiction.

## VII. Conclusion

Accordingly, the R & R [147] is ADOPTED IN PART and REJECTED IN PART. The School District Defendants' motion for summary judgment [108] is GRANTED, and Flowers's race-discrimination claims under Title VII, §§ 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment are DISMISSED. Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over Flowers's state-law claims, and those claims are DISMISSED WITHOUT PREJUDICE.[15] For this reason, Nichols' motion for summary judgment [110] is DENIED AS MOOT. The Clerk is DIRECTED to close this case.

---

**15.** In his opposition brief, Flowers admits that his slander claim is time-barred and offers to dismiss this claim with the consent of the parties. No separate consent motion was ever filed. The magistrate judge recommends granting summary judgment on this claim. This recommendation is rejected. The Court declines to selectively exercise supplemental jurisdiction. In any event, given Flowers's admission and offer of dismissal, if he subsequently seeks relief in state court it is improbable that he will assert a claim for slander.